AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Mark Leeper, being duly sworn, depose and state:

1.  I am a Special Agent (SA) for the United States Immigration and Customs Enforcement (ICE), within the Department of Homeland Security (DHS), which was previously known as the Immigration and Naturalization Service (INS). I have been employed by the INS and ICE since 1996 and I am currently assigned to the ICE Special Agent in Charge, Washington, D.C. office (SAC/DC) in Alexandria, Virginia.

2.  My duties as a Special Agent with ICE include, but are not limited to investigating the illicit manufacture of immigration documents and other related violations of the Immigration and Nationality Act and to seek, where applicable, prosecution and deportation of those violators. These duties also include investigating cases involving persons who have illegally reentered the United States after having been deported or removed.

3.  The information contained in this affidavit is based on my personal knowledge, observations, and interviews conducted during the course of this investigation, information conveyed to me by other law enforcement officials, and my review of records, documents and other physical evidence obtained during this investigation. I also have relied on information provided by confidential, reliable sources.

4.  This affidavit contains information necessary to support probable cause for this application. This affidavit

1

is not intended to include each and every fact and matter observed by me or known by the government.

## DESCRIPTION OF THE PREMISES TO BE SEARCHED

5.   I have conducted an investigation and have obtained evidence that I submit in this affidavit in support of an application for a warrant to search 526 Tuckerman Street NW, in Washington, D.C., in order to seize evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1546(a) and Section 1028(a)(4), Fraud and Related Activity in Connection with Identification Documents.  The structure is a red brick two-story duplex located on the south side of Tuckerman Street NW near the intersection with 6th Street NW.  There is a chain link fence surrounding the property and there is a white storm door in front of the green entry door with the numbers 526 prominently displayed above it.  Above the entry door is a semi-circle window.

## DESCRIPTION OF CRIMINAL ACTIVITY

6.    Based on my experience and training, I know that persons, usually aliens, manufacture and distribute counterfeit documents, including resident alien cards, social security cards, and employment authorization cards (collectively, "identity documents").  These persons distribute and sell the counterfeit identity documents to undocumented individuals who are in the United States illegally or who do not have permission to work in the

2

United States.  This investigation has revealed that those engaged in the business of manufacturing and selling illegal identity documents have adopted a modus operandi that they use to obstruct detection, surveillance, and apprehension.  Using this technique, it is typical for illicit identity document vendors in the 1600 through 1800 blocks of Columbia Road, NW, Washington, DC ("Columbia Road"), to solicit orders from customers by obtaining identifying information and photographs.  More and more frequently, in order to avoid surveillance by law enforcement agents, the vendors are taking the customers inside of stores or apartment buildings along Columbia Road, where they then obtain the customer's photograph and identifying information.  The vendors pass their orders to another individual, known as the "runner," who takes the information to a "document mill," where the information is used to create the actual illegal identity document.  Sometimes vendors use a cell phone to call the document mill to place the order.  These document mills are usually located in an apartment building or house in a location that is not easy to discover.  The documents are usually ready within an hour or two, at which time the runner brings them back to Columbia Road.  Computer equipment is sometimes used to help create the fake identity documents.  At Columbia Road, the documents go through another series of hand-to-hand transfers, ending with the original vendor giving the documents to the buyer in exchange for money.  Again, these final transactions often

take place inside of a building, rather than on the street, in order to frustrate surveillance by law enforcement agents.

7.   Since April 2002, I have been investigating several of these criminal organizations involved in the manufacture and distribution of counterfeit identity documents in and around the 1600 to 1800 blocks of Columbia Road.  During the course of the investigation, it has been discovered that at least three different fraudulent document-manufacturing organizations have operated, or currently operate, in the 1600 to 1800 blocks of Columbia Road. Based upon the information obtained during this ongoing investigation since 2002, this investigation has led to the execution of 10 search warrants, resulting in the location and dismantling of six document mills and the discovery of more than 10,000 illegal identity documents, and the arrest of approximately 100 illegal document vendors.

<u>IDENTIFICATION OF SUSPECTS, ORGANIZATIONAL HISTORY
AND CRIMINAL ACTIVITY AT PREMISES TO BE SEARCHED</u>

8.   As a result of the ongoing investigation into the illicit fraudulent document trade occurring in this immediate area, several organizations have been significantly reduced or eliminated altogether.  However, due to the extremely lucrative nature of the industry, when one organization is eliminated, existing groups readily attempt to fill the void vacated by their competition.  An individual known only as "Bolas" is now directing one such

group attempting to take advantage of a void created by prior enforcement activity. During the past several months, "Bolas" has aggressively brought in members from New York and North Carolina in order to maintain a stronghold on the north side of the 1600-1800 blocks of Columbia Road, NW. As described below, law enforcement officers have observed members of the "Bolas" organization engaging in the apparent sale of illegal identity documents.

    9. On June 17, 2005, your affiant received information from a cooperating private individual (CPI) who has provided reliable information in the past, that an individual known as "Pinguino," is a member of the "Bolas" organization who drives a tan Volkswagen, possibly a Golf or Jetta. The CPI also believes that "Pinguino" owns several other vehicles that are utilized by this group in the fraudulent document trade. This agent is familiar with "Pinguino," and has identified him as Francisco Peles, aka Aldabaran Rodriguez Guzman. Agents have confirmed that Francisco Peles drives a Volkswagon Jetta, with North Carolina registration, SXY-3604. This vehicle is registered to Aldebaran RODRIGUEZ-GUZMAN, of 5609 Keyway Boulevard Apartment T in Charlotte, NC 28215. On March 26, 2004, law enforcement agents recovered an express mail package which contained hundreds of fraudulent illegal identity documents that was being delivered from an address in South Carolina to an address in the District of Columbia. A forensic examination determined that a thumb print belonging to Francisco Peles was on one

5

of the sheets of illegal identity documents, indicating that he had handled those documents before they were mailed to the District of Columbia.

### SURVEILLANCE BY LAW ENFORCEMENT

10.  On June 21, 2005, this agent along with other law enforcement agents conducted surveillance of the 1600-1800 blocks of Columbia Road NW and identified at least 15 document vendors, including Francisco Peles, aka "Pinguino," attempting to solicit customers in this two-block area.  Law enforcement agents saw some of the vendors take customers inside of stores, where they remained out of view for several minutes.  When they reemerged into view, the customers often left the area, and the vendors remained in the area to continue soliciting customers.  Then, an hour or two later, the customers who had been observed earlier returned to meet with a vendor.  The customer and vendor would go inside of a building and reappear a short time later.  These actions are consistent with the way illegal documents are now sold along Columbia Road.  These practices have been confirmed through interviews with individuals who have participated in the sale of illegal documents, and through at least one undercover purchase of illegal identity documents by law enforcement agents since June, 2005.

11.  Law enforcement agents have also conducted surveillance in an effort to locate the document mill where the illegal identity documents are being produced.  In short, agents observed various Hispanic males – believed to

6

be "runners" - driving between the Columbia Road area known for the sale of illegal identity documents and 526 Tuckerman Street, NW.  The following events have led law enforcement agents to conclude that the illegal documents are being produced at 526 Tuckerman Street, NW, Washington, DC.

    12.  On July 6, 2005, agents observed a teal Dodge Shadow, bearing North Carolina registration, TTX-4737, heading eastbound on Tuckerman Street, NW.  The vehicle is registered to Pedro HERNANDEZ-GUTIERREZ of 1012 Carolina Avenue in Durham, NC.  A short time later, agents saw the Dodge Shadow parked within two or three houses of 526 Tuckerman Street, NW. Agents conducted surveillance of the vehicle and after approximately 25 minutes, observed two Hispanic males enter the Dodge Shadow and then drive away.  The driver was wearing a sleeveless red shirt and the passenger was donning a black baseball hat and a red T-shirt.  The vehicle was followed to the intersection of 14th and Irving Streets NW, when the driver stopped abruptly and allowed the passenger to exit the vehicle near the Columbia Heights Metro Station.  At this time, an ICE agent followed the passenger on foot, as he walked westbound on Irving Street towards 16th Street.  The passenger was followed all the way to the intersection of Columbia and Ontario Roads NW, where he was later observed loitering with several previously identified document vendors on the south side of Columbia Road.  The vehicle was then located parked on Ontario Road near the intersection with Columbia Road and

7

the driver wearing the red sleeveless T-shirt was observed exiting the vehicle and walking eastbound on the north side of Columbia Road, in an area known for the sale of illegal identity documents.

   13. On July 19, 2005, agents conducted surveillance of the 500 block of Tuckerman Street NW.  The teal Dodge Shadow bearing NC registration, TTX-4737, was parked on the north side of Tuckerman Street directly across from 526 Tuckerman Street.  Agents watched two Hispanic males cross Tuckerman Street, from the immediate vicinity of 526 Tuckerman, close what appeared to be a gate, and then proceed to the Dodge Shadow.  The vehicle was then followed to Lanier Place NW, where it was parked one street from the 1600 block of Columbia Road.  The two occupants exited the vehicle.  One individual went into the El Miguelino's Restaurant, located in the 1700 block of Columbia Road NW, and the second individual walked to the south side of Columbia Road near the Adventure Travel Agency. Both of these locations on Columbia Road are known as places where fraudulent document vendors from Bolas' group take customers in order to complete transactions for the sale of illegal identity documents.

   14. On July 21, 2005, agents conducted surveillance of 526 Tuckerman Street NW and observed the teal Dodge Shadow bearing NC registration, TTX-4737, parked on the south side of Tuckerman Street facing east, directly in front of 526 Tuckerman.  Agents observed one Hispanic male proceed up

8

from the back yard of 526 Tuckerman, delineated by a chain link fence separating 526 Tuckerman from 524 Tuckerman, close the gate separating the front and back yard of 526 Tuckerman, and enter the vehicle and depart the area.

    15.  On July 25, 2005, this writer observed the teal Dodge Shadow bearing NC registration, TTX-4737, driving eastbound on the 1700 block of Lanier Place which is directly behind the 1700 block of Columbia Road, NW.  The vehicle was followed to 526 Tuckerman Street NW where it parked. Two Hispanic males were immediately observed walking through the front yard of 526 Tuckerman Street and then entering the white basement door located in the rear of 526 Tuckerman, which is also accessible from the alley located between Tuckerman Street and Somerset Place.  One of the two individuals was wearing a blue and white sports jersey with the number 12 on it.

    16.  On July 26, 2005, this writer observed the teal Dodge Shadow bearing NC registration, TTX-4737, parked directly behind the Safeway on the 1700 block of Columbia Road NW.  Approximately one-half hour later, the Dodge Shadow was located parked in front of 526 Tuckerman Street NW.  A Hispanic male wearing a white and red sport jersey with the number 23 exited the driver's side door and went to the rear of 526 Tuckerman Street.  This individual was the same male that was observed on July 25, 2005, wearing the blue and white sports jersey with the number 12 on it. Approximately one hour later, the individual exited 526

9

Tuckerman Street and departed the area in the Dodge Shadow. The vehicle was followed to 3170 Mount Pleasant Road where a second Hispanic male wearing a white shirt and shorts entered the vehicle. The two men proceeded to 16th Street, where the vehicle stopped and the passenger wearing all white exited the vehicle and headed south on 16th Street towards Columbia Road. Approximately 20 minutes later, the Dodge Shadow was located parked in front of 526 Tuckerman Street.

17. Later that same afternoon at approximately 1600 hours on July 26, 2005, this writer observed the teal Dodge Shadow bearing NC registration, TTX-4737, parked on the 1600 block of Harvard Street, NW, which is one block from Columbia Road. This writer then drove down the 1700 block of Columbia Road where he observed the same Hispanic male wearing the white and red sports jersey with the number 23 sitting at the bus stop located at Ontario and Columbia Road. This is the same individual who was seen driving the teal Dodge Shadow earlier in the day. During the course of this investigation, law enforcement agents have observed members of Bolas' group soliciting numerous customers for the sale of illegal identity documents at this particular bus stop. Moreover, in the recent past, at least one member of Bolas' group was arrested in possession of illegal identity documents at the bus stop.

18. Based upon my experience investigating the sale of illegal identity documents and the location of illegal

documents, I submit that there is probable cause to believe that located within the residence located at 526 Tuckerman Street, NW, Washington, D.C., illegal documents are being made, including through the use of computer system(s), and therefore there is evidence, fruits and instrumentalities of criminal activity, specifically, records, computer systems, computer hardware, computer software, and computer-related documentation.

## SEARCH OF COMPUTER SYSTEM

19.  Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware and software which are (1) instrumentalities, fruits, or evidence of crime; or (2) storage devices for information about crime

20.  For purposes of this affidavit, unless otherwise specifically indicated, the term "computer" refers to the box that houses the central processing unit (CPU), along with any internal storage devices (such as internal hard drives) and internal communications devices (such as

11

internal modems capable of sending/receiving electronic mail, and FAX cards) along with any other hardware stored or housed internally. Thus, "computer" refers to hardware, software, and data contained in the main unit. Printers, external modems (attached by cable to the main unit), monitors, and other external attachments will be referred to collectively as peripherals and discussed individually when appropriate. When the computer and all peripherals are referred to as one package, the term "computer system" is used. "Information" refers to all the information on a computer system including both software applications and data.

    21. The term "computer hardware" as used in this affidavit refers to all equipment that can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes (but is not limited to) any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and

connections, recording equipment, and RAM or ROM units); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

22. The term "computer software" as used in this affidavit refers to digital information that can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical or other digital form. It commonly includes programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

23. "Computer-related documentation" consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, software, or other related items

24. Based upon my experience from past investigations of fraudulent document organizations, I have found that fraudulent document manufacturers maintain computer-generated images of identification documents such as alien registration receipt cards and social security cards, financial records, lists of computer transactions and employee records for services rendered and other documents relating to Trafficking in False Identification Documents.

25. Based upon the above, your affiant has reason to believe that any computer(s) and software found in the

residence located at 526 Tuckerman Street, NW, Washington, D.C., contain information, software and related documentation that can show the procedures of operation of a business engaged in trafficking in false identification documents, which is in violation of 18 U.S.C. Sections 1028 and 1546.

26. Based upon my knowledge, training and information obtained from a Computer Analyst, I know that searching computerized information for evidence or instrumentalities of crime commonly requires agents to create an image of the computer, or to seize most or all of a computer system's input/output peripheral devices, related software, and documentation so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.  This is true because of the following:

    a.  <u>The volume of evidence</u>.  A suspect may try to conceal criminal evidence; he/she might store it in random order with deceptive file names.  This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime.  This sorting process may take a short amount of time in which an image of the computer may be sufficient, however this sorting process can take weeks or months, depending on the volume of data stored.  In this case it would be impractical to attempt this kind of data search on site.

    b.  <u>Technical requirements</u>.  Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data.  In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password

protected, or encrypted files.  Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction, a controlled environment is essential to its complete and accurate analysis.

c. <u>Need to re-create the particular computer system to be searched</u>.  The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software.  Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system.  It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above.  In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software that may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

27.  If, after inspecting the input/output devices, software and documentation, the analyst determines that these items are no longer necessary to retrieve and preserve the data evidence, the government will leave them on-site after making an image or, if originally seized, the government will return them within a reasonable time.

28.  The analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different

techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the pertinent files, in order to locate the evidence and instrumentalities authorized for seizure by the warrant); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; or performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.    29. Based on the foregoing, I submit that there is probable cause to believe that fruits, evidence and instrumentalities of a crime, namely false identification documents, including fake social security cards, alien registration cards and resident alien cards are located at or within 526 Tuckerman Street NW, Washington, D.C.  Accordingly, I request a search

warrant for the premises described in Attachment A, to include computer system(s) found within the premises, and to seize the documents and objects listed in Attachment B.

```
                              _____
                              Mark Leeper, Special Agent
                              US ICE
```

Subscribed and sworn to before me this _____ day of August 2005.

_____
United States Magistrate Judge